UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

                       Plaintiff,

    -against-

TYRONE CARTHEN,

                       Defendant.
-------------------------------------------------------------X

**Report and Recommendation**

10-CR-319 (DLI) (JMA)

APPEARANCES:

Loretta Lynch
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
    By Tyler Smith
         Assistant United States Attorney

Michael Schneider
Federal Defenders of New York, Inc.
1 Pierrepont Plaza, 16th Floor
Brooklyn, New York 11201
    Attorney for Defendant

**AZRACK, United States Magistrate Judge:**

On January 15, 2009, the Honorable James R. Spenser, Chief Judge of the United States District Court of the Eastern District of Virginia, sentenced defendant Tyrone Carthen ("Carthen") to twenty-two months imprisonment and three years supervised release following his conviction for 18 U.S.C. §§ 922(g)(1) and 924(a)(2), possession of a firearm by a convicted felon. On February 26, 2010, Carthen commenced his term of supervised release. The Government charges Carthen with two violations of supervised release for, among other things, conduct constituting felony assault and/or attempted assault and misdemeanor assault and aggravated harassment. The alleged conduct violates Carthen's mandatory condition of

supervised release, which prohibits "commit[ing] another federal, state, or local crime." By Order dated May 20, 2010, the Honorable Dora Lizette Irizarry referred Carthen's violation of supervised release hearing to me for a Report and Recommendation. For the reasons discussed below, I respectfully recommend that the Court find that the Government has established Carthen's supervised release violations by a preponderance of the evidence.

## I. FACTUAL FINDINGS

On June 7, 2010, I held a violation of supervised release hearing ("VOSR hearing") to determine whether Carthen violated the conditions of his supervised release. Senior U.S. Probation & Parole Officer Darcy A. Zavatsky ("Zavatsky") testified for the Government based on her interviews with victim Marquita Cox[1] ("Cox"), Cox's mother, and Cox's close friend Takima Booker ("Booker"). Zavatsky interviewed Cox on six occasions, three times over the phone and three times in person.[2] (Violation of Supervised Release Hearing Transcript, June 7, 2010 ("Hr'g Tr.") at 9.) Based on these interviews with Cox, Zavatsky testified as follows:

On February 26, 2010, Carthen commenced his term of supervised release. (Hr'g Tr. at 5.) Upon being released from the Brooklyn Residential Re-entry Center halfway house, Carthen went to Cox's mother's apartment, knocked on the door, and Cox let him in. (Id. at 12.) Carthen immediately put both hands around Cox's throat, forced her up against the wall, choked her until

---

[1] Cox and Carthen have three children together. (Government's Violation of Supervised Release Report "VOSR Report" at 2.)

[2] Prior to the VOSR hearing, Cox arrived in the courtroom. Although she refused to testify, she spoke with Zavatsky before the hearing commenced. (Hr'g Tr. at 9.) Zavatsky included this discussion when calculating the number of times she spoke with Cox. (Id.) On April 6, 2010, Zavatsky interviewed Cox by telephone. (Id. at 11.) On April 8, 2010, Zavatsky interviewed Cox in person; the interview lasted approximately one hour. (Id. at 10.) During the interview, Cox recounted Carthen's abusive behavior and stated she would testify at a violation hearing. (Id.) On May 7, 2010 and May 10, 2010, Zavatksy interviewed Cox by telephone. (Id. at 11-12.) During these interviews, Cox stated she no longer wanted to testify at the hearing. (Id. at 11.) On June 3, 2010, Zavatsky interviewed Cox in person; the interview lasted approximately ten to fifteen minutes. (Id.) On cross-examination, Zavatsky noted that she also met with Cox at Cox's home on March 9, 2010. (Id. at 28.) Cox did not mention any abuse by Carthen at that time. (Id.)

2

she almost lost consciousness, and repeatedly demanded to know the location of Cox's boyfriend, Michael Joyner ("Joyner"). (Id.) When Carthen released Cox, she ran to the bathroom, where Joyner was located, and held the door closed from the outside. (Id.) As she held the door closed with both hands, Carthen stabbed Cox in her right hand with scissors, causing it to bleed. (Id. at 13.) Cox did not seek medical attention for the wound. (Id.) On April 8, 2010, Cox showed Zavatsky the scar, which was consistent with a puncture wound from a pair of scissors. (Id.) Cox did not file a police report for this incident. (Id. at 34.)

On March 15, 2010, Cox, her mother, Joyner, and Booker were at Cox's mother's apartment. (Hr'g Tr. at 14.) Carthen arrived at the apartment and yelled to Cox to come outside to talk to him. (Id.) When Cox refused, Carthen banged on the apartment door. (Id.) Cox's mother went into the hallway to speak with Carthen and tried to make him leave. (Id.) When he refused to leave, Cox's mother called the police at which point Carthen hailed a cab. (Id.) A NYPD domestic incident report indicates that the police were called to the scene. (Gov't Ex. 4.) The police report notes that Cox stated that Carthen "verbally harassed her by means of yelling and screaming and knocking on [her] door." (VOSR Report at 7; Gov't Ex. 4) However, the police did not make arrests at the scene because "no offense [was] committed." (Gov't Ex. 4.)

Booker corroborated Cox's description of the March 15, 2010 incident in interviews with Zavatksy.[3] (Hr'g Tr. at 22.) Booker recounted that Carthen repeatedly called Cox and tried to persuade her to meet with him outside. (Id. at 24.) When Cox declined to go outside, Cox's mother went into the hallway to try to make Carthen leave. (Id.) Cox's mother then called the police. (Id.)

---

[3] Zavatsky interviewed Booker by telephone on April 9, 2010 and April 14, 2010. (Id. at 22.) The interviews lasted a total of fifteen minutes. (Id.)

Cox's mother also corroborated Cox's description of the March 15, 2010 incident,[4] stating that Carthen repeatedly called Cox on her cell phone and then arrived at the apartment. (Hr'g Tr. at 25.) After arguing with Carthen, Cox's mother called the police and Carthen then left the scene. (Id.) During her interviews with Zavatsky, Cox's mother stated that she did not like Carthen and did not want him at her apartment because he was arrogant, disrespectful, and abusive towards her daughter. (Id. at 26, 37.) However, she admitted that Carthen was a very good father. (Id. at 25.)

In addition to the March 15, 2010 incident, Cox recounted that on or about March 21, 2010, at approximately 3:30 PM, Carthen came to Cox's former residence, where she and Booker were located. (Hr'g Tr. at 15-16.) Carthen started to argue with Cox in the street and then asked her to go into the building's vestibule area. (Id. at 16.) Once inside the building's hallway, Carthen choked Cox, slammed her head against a door, ripped off her wig, tore off her cell phone attached to a lanyard around her neck, and snatched her pocketbook out of her hand, causing all the contents to spill onto the floor. (Id.) Carthen then grabbed Booker's phone from her hand, confiscated both Cox's and Booker's cell phones, and refused to let the women leave the apartment without him. (Id. at 17.) Carthen continued to verbally and physically abuse Cox throughout the evening. (Id.) When Booker and Cox told Carthen that they wanted to meet Booker's father, Carthen told Cox she was not going anywhere without him, and the two argued. (Id.) As Cox dressed her two-year old son to bring him to the babysitter, Carthen choked Cox and pressed his fist into the side of her cheek while she was holding her son. (Id. at 17-18.)

The next morning, Booker and Cox took the children to school and, later that day, Cox and her ten-year old daughter went to Safe Horizons, a domestic abuse shelter. (Id. at 19.) On

---

[4] Zavatksy interviewed Cox's mother by telephone on April 9, 2010 and April 12, 2010. (Id. at 25.) The interviews lasted a total of fifteen minutes. (Id.)

March 23, 2010, Cox filed, and the Family Court issued, a Temporary Order of Protection, mandating that Carthen "refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, disorderly conduct . . . or any criminal offense against Marquita Cox." (Gov't Ex. 5.)

Booker corroborated Cox's description of the March 21, 2010 incident, noting that she witnessed Carthen choke Cox in the hallway, rip her wig off, slap her across the face with an open fist, tear her cell phone from a lanyard off her neck, and spill the contents of Cox's pocketbook. (Hr'g Tr. at 22.) Booker also stated that Carthen held both of the women's phones for the majority of the evening. (Id. at 23.) Booker clarified, however, that while she heard Carthen and Cox argue, she did not witness any other physical abuse because she was in the front bedroom with the children. (Id.)

On April 5, 2010, Carthen reported to the Probation Department and provided Zavatsky with copies of the Temporary Order of Protection and the Family Offense Petition filed by Cox in family court. (Hr'g Tr. 5.) Carthen told Zavatsky that Cox lied about the charges listed in the petition and that he "would have been locked up" if he had done what Cox charged. (Id. at 9.) Carthen also speculated that Cox's mother put her up to petition. (Id.)

On April 13, 2010, the Family Court issued a Permanent Order of Protection, ordering Carthen to "refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, [and] disorderly conduct . . . ." (Hr'g Tr. at 19; Gov't Ex. 7.) Since the issuance of the Permanent Order of Protection, Cox has not spoken to Carthen. (Id. at 31.) On May 7, 2010, Judge Irizarry detained Carthen pending his supervised release hearing. (Dkt. Nos. 5, 6.)

On the day of the VOSR hearing, Cox advised Assistant United States Attorney Tyler Smith and Zavatsky that she exaggerated some of the information in the Family Offense Petition, specifically stating that on February 26, 2010, Carthen did not stab her with the scissors, but rather grazed her with the scissors. (Hr'g Tr. at 34.) Although the Family Offense Petition stated that Carthen had threatened to kill Cox and punched Cox in the face, Cox now claims that she never stated that Carthen threatened to kill her. (Id.) Cox also now claims that she never stated that Carthen punched her in the face, rather he had "slammed her face against the door on March 21 and then later that evening had pressed his fist into her face." (Id.) Cox also added that she failed to note in the petition that she often fought back with Carthen. (Id. at 39.)

Although Cox arrived at the hearing, she refused to testify. Zavatsky told the Court that Cox's refusal to testify stemmed from, among other things, the fact that Cox has not had a problem with Carthen since the issuance of the Permanent Order of Protection.[5] (Id. at 31.) Cox also noted that she did not feel threatened by Carthen. (Id. at 32.) Besides Zavatsky, the Government did not call any other witnesses at the hearing. Zavatsky never asked Booker to testify in court and Zavatsky was unable to contact Cox's mother by telephone. (Id. at 38.) Carthen did not testify and defense counsel did call any witnesses.

## II. DISCUSSION

The government charges Carthen with two violations of supervised release. Charge one alleges that Carthen "engaged in conduct constituting a felony assault and/or attempted assault." (VOSR Report at 4.) Charge two alleges that Carthen "engaged in conduct constituting assault, attempted assault, aggravated harassment, menacing, reckless endangerment and/or harassment."

---

[5] On May 7, 2010, Cox also told Zavatsky that she would refuse to testify at the hearing because she did not want to be involved anymore, Carthen had not violated the Permanent Order of Protection, and Cox did not want to be responsible for sending Carthen back to jail. (Hr'g Tr. at 30.) Cox also stated that she "should have just taken the ass whipping and not reported what happened." (Id.)

6

(VOSR Report at 4-5.) Although Carthen was never charged or convicted with a specific federal, state, or local crime, his conduct alone constitutes a crime in violation of his supervised release. The U.S. Sentencing Guidelines Manual's commentary on Section 18 U.S.C. §§ 3563(a)(1) and 3583(d) provides, in pertinent part:

> A mandatory condition of probation and supervised release is that the defendant not commit another federal, state, or local crime. A violation of this condition may be charged whether or not the defendant has been the subject of a separate federal, state, or local prosecution for such conduct. The grade of violation does not depend upon the conduct that is the subject of criminal charges or of which the defendant is convicted in a criminal proceeding. Rather, the grade of the violation is to be based on the defendant's actual conduct.

U.S. Sentencing Guidelines Manual § 7B1.1 Classification cmt. n.1 (2010) (emphasis added).

At a supervised release violation hearing, the government "need prove the alleged supervised-release violation only by a preponderance of the evidence, not beyond a reasonable doubt." United States v. Pelensky, 129 F.3d 63, 68 n.8 (2d Cir. 1997) (citing 18 U.S.C. § 3583(e)(3)). The Supreme Court determined that "the revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due to a defendant in such a proceeding does not apply to parole revocations." Morrissey v. Brewer, 408 U.S. 471, 480 (1972). Therefore, because revocation proceedings are not considered criminal prosecutions, they are not subject to the procedural safeguards offered at criminal proceedings. Pelensky, 129 F.3d at 63 (finding that "most of the fundamental constitutional procedural protections that are normally applicable to a criminal prosecution are not required for supervised-release proceedings as a matter of constitutional law").

Accordingly, in assessing whether a violation of supervised release occurred, standard evidentiary rules do not apply. The Second Circuit consistently holds that the right of confrontation does not apply to revocation hearings and does not prohibit the consideration of

7

hearsay testimony in violation of supervised release proceedings. United States v. Aspinall, 389 F.3d 332, 340 (2d Cir. 2004) (noting "the inapplicability of the Confrontation Clause and the Federal Rules of Evidence to probation revocation proceedings") (abrogated on other grounds). However, the Federal Rules of Criminal Procedure provides that in a revocation hearing, the defendant must have "an opportunity . . . to question any adverse witness, unless the judge determines that the interest of justice does not require the witness to appear." United States v. Williams, 443 F.3d 35, 45 (2d Cir. 2006) (citing Fed. R. Crim. P. 32.1(b)(2)(c)(2009)). In making that determination, the court "must balance, on the one hand, the defendant's interest in confronting the declarant, against . . . the government's reasons for not producing the witness and the reliability of the proffered hearsay." Williams, 443 F.3d at 45; U.S. v. Jackson, 247 Fed. Appx. 701, 701 (2d Cir. 2009) (noting "[v]ictims' hearsay accounts of assaults by supervisee were sufficiently reliable to warrant their admission at supervised release revocation hearing").

Cox refused to testify because, according to Zavatsky, Cox did not want to be responsible for sending Carthen to jail. (Hr'g Tr. at 30.) The Government did not call Cox's mother or Booker. Although the Government only called Probation Officer Zavatsky, I find her testimony to be credible. Zavatsky testified to Carthen's violations based on her six interviews with Cox and her two interviews with both Cox's mother and Booker. Defense counsel had an opportunity to cross-examine Zavatsky regarding her interviews with Cox, Cox's mother, and Booker. Cox's detailed description of Carthen's abuse on March 15, 2010 and March 21, 2010 corroborates Cox's mother's and Booker's descriptions of Carthen's behavior on these respective dates, and the Government further corroborated Carthen's conduct on these dates with a NYPD domestic

incident report,[6] the Temporary Order of Protection, the Family Offense Petition, and the Order of Permanent Protection.

### III. CONCLUSION

I therefore find that the Government has established by a preponderance of the evidence that Carthen violated mandatory conditions of his supervised release by engaging in conduct constituting federal or state crimes. Accordingly, I respectfully recommend that the Court revoke Carthen's supervised release. Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, with fourteen (14) days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment entered by the District Court in reliance on this Report and Recommendation. See 28 U.S.C. § 636(b)(1) (2005); Fed. R. Civ. P. 72, 6(a), 6(e).

SO ORDERED.

Dated: June 30, 2010
Brooklyn, New York

s/Joan M. Azrack

JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE

---

[6] While this report is inconclusive as to whether Carthen engaged in criminal conduct, it corroborates Cox's statement that Cox's mother called the police on March 15, 2010.

9